**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | | |
|---|---|---|
| STEPHEN OSTROW, Derivatively on Behalf of Nominal Defendant LUMEN TECHNOLOGIES, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| KATE JOHNSON, QUINCY L. ALLEN, MARTHA H. BEJAR, PETER C. BROWN, GENERAL KEVIN P. CHILTON,  STEVEN T. CLONTZ, T. MICHAEL GLENN, HAL S. JONES LAURIE A. SIEGEL, JEFFREY K. STOREY, VIRGINIA BOULET, W. BRUCE HANKS, MICHAEL J. ROBERTS, CHRISTOPHER STANSBURY, INDRANEEL DEV, MAXINE L. MOREAU, SHAUN C. ANDREWS, EDWARD MORCHE, and ANDREW DUGAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| LUMEN TECHNOLOGIES, INC., | ) ) | |
| Nominal Defendant. | ) ) | |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Stephen Ostrow ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Lumen Technologies, Inc. (herein referred to as "Lumen" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law.  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's publicly available documents, including the allegations of the amended consolidated class action complaint filed in the securities class action captioned *Voigt v. Lumen Technologies*, *Inc.,* Case No.: 3:23-cv-00286-TAD-KDM (W.D. La.) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission (the "SEC"), press releases published by and regarding Lumen, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Lumen against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least September 14, 2020, and February 7, 2023, inclusive (the "Relevant Period") and violation of the federal securities laws by causing the issuance of materially false and misleading statements in the Company's December 8, 2020 proxy statement filed with the SEC on Form 424B3 (the "Proxy") and in other public statements that have exposed the Company to massive class-wide liability, as well as the expenditure substantial defense costs in connection with the Securities Class Action, as set forth below.

2.      At the start of the Relevant Period, Lumen, formerly known as CenturyLink, announced that it was expanding its business, which then-served the enterprise and wholesale markets, by utilizing its 400,000 miles of fiber optic cable to provide its Quantum Fiber service to the small and medium business ("SMB") and residential markets. Various Company executives touted Lumen's investment and penetration of the SMB and residential markets, representing that the Company was experiencing higher average revenue per user ("ARPU"), improving Lumen's

revenue and margin trends.

3.      On February 9, 2022, however, during an earnings conference call regarding Lumen's fourth quarter 2021 financial and operational results, the Company acknowledged that the expansion into the SMB and residential markets was proceeding slower than previously stated. Lumen's stock price declined $1.99 on this news, closing at $10.83 per share on February 10, 2022, compared to a close of $12.82 per share on February 9, 2022.

4.      On November 2, 2022, during a conference call regarding the Company's financial and operational results for the third fiscal quarter and nine months ended September 30, 2022, then-President and CEO, Jeff K. Storey stated, "let me be clear, we are not yet at the pace of build we expect or want" with respect to the Company's Quantum Fiber services. Following this admission, Lumen's stock price declined from a close of $7.05 per share on November 2, 2022, to a close of $5.80 on November 3, 2022.

5.      On February 7, 2023 during a conference call regarding the Company's financial and operational results for the fiscal quarter and full year ended December 31, 2022, the Company admitted that it was re-evaluating its strategic priorities and that Lumen had essentially stopped its investment in the Company's Quantum Fiber network, as well as its expansion into the SMB and residential markets. Upon the news that Lumen's Quantum Fiber expansion progress was slower than previously represented, causing the Company to halt investment in that business line, the price of Lumen's common stock declined $1.04, from a close of $4.99 per share on February 7, 2023, to a close of $3.95 on February 8, 2023.

6.      On March 3, 2023, a class action securities complaint was filed in the United States District Court for the Western District of Louisiana, Monroe Division, entitled *Voight v. Lumen Technologies, Inc. et al.*, C.A. No. 3:23-cv-00286 (W.D. La) (the Securities Class Action").

Lumen, along various former and current officers of the Company, are named as defendants in the Securities Class Action, which alleges violation of the §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. § 240.10b-5 based, *inter alia*, on materially false and misleading statements issued in connection with the Company's Quantum Fiber business. Lumen, which must now expend substantial defense costs to defend itself in the Securities Class Action, is exposed to massive class-wide liability, due to the wrongful conduct of these former and current Company officers.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

9.      This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

**11.**     Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Lumen is headquartered in this District, Lumen is incorporated

within this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

12.     Plaintiff Stephen Ostrow is, and has been at all relevant times, a shareholder of Lumen, including the period prior to the Merger.

*Nominal Defendant*

13.     Nominal Defendant Lumen is incorporated under the laws of the State of Louisiana.

14.     The Company's principal executive offices are located at 100 CenturyLink Drive, Monroe, Louisiana 71203.  Lumen's common stock trades on the NYSE under the ticker symbol "LUMN."

*Director Defendants*

15.     Defendant Kate Johnson ("Johnson") has served as Lumen's President and Chief Executive Officer ("CEO") since November 2022. According to the Company's public filings, Defendant Johnson received $4,778,130 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Johnson beneficially owned 8,468,818 shares of Lumen common stock, worth $14,481,678.[1]

16.     Defendant Quincy L. Allen ("Allen") has served as a member of the Board since February 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Allen received $345,560 in 2022 in compensation from the Company.

17.     Defendant Martha H. Bejar ("Bejar") has served as a member of the Board since

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $1.71 closing price of Lumen common stock on March 21, 2024.

2016. According to the Company's public filings, Defendant Bejar received $380,560 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Bejar beneficially owned 75,822 shares of Lumen common stock, worth $129,655.

18.     Defendant Peter C. Brown ("Brown") has served as a member of the Board since 2009 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Brown received $343,560 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Brown beneficially owned 188,723 shares of Lumen common stock, worth $322,716.

19.     Defendant General Kevin P. Chilton ("Chilton") has served as a member of the Board since 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Chilton received $358,560 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Chilton beneficially owned 91,912 shares of Lumen common stock, worth $157,169.

20.     Defendant Steven T. Clontz ("Clontz") has served as a member of the Board since 2017. According to the Company's public filings, Defendant Clontz received $344,541 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Clontz beneficially owned 425,634 shares of Lumen common stock, worth $727,834.

21.     Defendant T. Michael Glenn ("Glenn") has served as a member of the Board since 2017. According to the Company's public filings, Defendant Glenn received $548,560 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Glenn beneficially owned 199,362 shares of Lumen common stock, worth $340,909.

22.     Defendant Hal S. Jones ("Jones") has served as a member of the Board since 2009 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant

Jones received $343,560 in 2022 in Compensation from the Company. As of March 21, 2024, Defendant Jones beneficially owned 146,594 shares of Lumen common stock, worth $250,675.

23.     Defendant Laurie A. Siegel ("Siegel") has served as a member of the Board since 2009. According to the Company's public filings, Defendant Siegel received $381,060 in 2022 in compensation from the Company. As of March 21, 2024, Defendant Siegel beneficially owned 224,452 shares of Lumen common stock, worth $383,812.

***Former Director Defendants***

24.     Defendant Virginia Boulet ("Boulet") served as a member of the Board from 1995 until May 2021.

25.     Defendant W. Bruce Hanks ("Hanks") served as a member of the Board from 1992 until May 2023. According to the Company's public filings, Defendant Hanks received $466,573 in 2022 in compensation from the Company.

26.     Defendant Michael J. Roberts ("Roberts") served as a member of the Board from 2011 until May 2024.

27.     Defendant Jeffrey K. Storey ("Storey") served as a member of the Board from 2017 until November 2022. From 2018 until November 2022, Defendant Storey served as Lumen's CEO. Prior to that Defendant Storey served as Lumen's Chief Operations Officer ("COO") from 2017 until 2018. According to the Company's public filings, Defendant Storey received $19,816,806 in 2022 in compensation from the Company.

***Officer Defendants***

28.     Defendant Christopher Stansbury ("Stansbury") has served as Lumen's Executive Vice President ("EVP") and Chief Financial Officer ("CFO") since April 2022. According to the Company's public filings, Defendant Stansbury received $10,161,435 in 2022 in compensation

from the Company. As of March 21, 2024, Defendant Stansbury beneficially owned 4,412,517 shares of Lumen common stock, worth $7,545,404.

29.     Defendant Indraneel Dev ("Dev") served as Lumen's CFO from 2018 until April 2022. According to the Company's public filings, Defendant Dev received $6,524,928 in 2022 in compensation from the Company.

30.     Defendant Shaun C. Andrews ("Andrews") served as Lumen's EVP and Chief Marketing Officer ("CMO") from 2019 until March 2023. According to the Company's public filings, Defendant Andrews received $2,699,054 in 2022 in compensation from the Company.

31.     Defendant Maxine L. Moreau ("Moreau") has served as Lumen's President of Consumer Markets Division at all relevant times.

32.     Defendant Edward Morche ("Morche") has served as Lumen's President of North America Enterprise and Public Sector at all relevant times.

33.     Defendant Andrew Dugan ("Dugan") served as Lumen's Chief Technology Officer ("CTO") at all relevant times.

34.     The Director Defendants, Former Director Defendants, and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

35.     By reason of their positions as officers and/or directors of Lumen, and because of their ability to control the business and corporate affairs of Lumen, the Director Defendants owed Lumen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lumen in a fair, just, honest, and equitable manner. The Director Defendants were and are required to act in furtherance of the best interests of Lumen and its shareholders.

36.     Each director and officer of the Company owes to Lumen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Lumen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Lumen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Director Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lumen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Director Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information

regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Lumen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Lumen were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Lumen's own Code of Conduct;

(b)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Remain informed as to how Lumen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of Lumen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Lumen's operations would comply with all applicable laws and Lumen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

      (g)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

42.    The Director Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lumen.

43.    At all times relevant hereto, the Director Defendants were the agents of each other and of Lumen and were at all times acting within the course and scope of such agency.

44.    Each of the Director Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## LUMEN'S CODE OF CONDUCT

45.    Lumen's Code of Conduct begins with a message from Defendant Johnson, which states, in pertinent part:

> We must all commit to the highest standard of behavior and daily interactions, Every Lumen employee should feel safe, valued, and seen, and the responsibility falls on each of us to ensure this happens.
>
> To that end, we have a playbook that outlines our Code of Conduct that we must use as our guideposts. Whether you are seeing this for the first time, or you are refreshing your memory for the tenth, I hope you will join me in considering this as the minimum standard of care for each other in our workplace.

46.     The Code of Conduct applies to "[a]ll employees, officers and directors of Lumen," and violations of the Code of Conduct may result in "disciplinary action up to and including termination, as well as possible civil or criminal liability."

47.     In a section titled "Our Operating Principles and Core Beliefs," the Code of Conduct includes the commitment to "[t]elling the whole story by representing information and data accurately and timely even when difficult."

48.     In a subsection titled "Accounting and financial reporting," the Code of Conduct states, in pertinent part:

> Each of us has a duty to ensure that all entries in our Company's financial records give an honest picture of the results of our operations and our financial position. We do this by complying not only with our Company's policies, but also with the laws, rules and regulations that govern our financial accounting and reporting. In particular, this means that we must:
>
> - Accurately record all assets, liabilities, revenues and expenses
>
> - Follow all internal controls procedures
>
> *       *       *
>
> Our senior financial officers—including, but not limited to, our Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer—have additional responsibilities. They must ensure that the financial information we disclose in public communications and file in the Company periodic reports with the Securities and Exchange Commission ("SEC") is full, fair, accurate, timely and understandable. In addition, senior financial officers are required to:
>
> - Help maintain reliable internal controls, assess their quality and effectiveness, implement improvements, and report or resolve weaknesses that could materially affect or render financial disclosures or reports inaccurate
>
> - Inform the Disclosure Committee of transactions, events or circumstances that could have a material impact on our Company's financial reports.

12

## LUMEN'S AUDIT COMMITTEE CHARTER

49.     Lumen's Audit Committee Charter states that the purpose of the Audit Committee is to:

> [A]ssist the Board of Directors (the "Board") in fulfilling its oversight responsibilities by (1) overseeing the Company's system of financial reporting, auditing, controls and legal compliance, (2) monitoring the operation of such system and the integrity of the Company's financial statements and related disclosures . . . and [] overseeing the Company's finance functions.

50.     In a subsection titled "Review of Financial Reporting," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

> 5. review and discuss with management and the outside auditors the Company's quarterly financial statements and MD&A disclosures prior to their public release
>
> 6. discuss with management the Company's earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies
>
> 7. review with management and the outside auditors the Company's financial information including (a) any report, opinion or review rendered on the financial statements by management or the outside auditors (including under AS No. 1301/SAS No. 114 or AS No. 4105/SAS No. 100) and (b) any analysis prepared by management or the outside auditors setting forth significant financial reporting issues and judgment made in connection with the preparation of the financial statements.

51.     The Audit Committee Charter further assigns the Audit Committee the responsibility of reviewing with management:

> a.   the Company's annual assessment of its internal controls and the related written reports required under §404 of the Sarbanes-Oxley Act
>
> b.   the adequacy of the Company's internal controls
>
> c.   reports, no less than quarterly, regarding internal control assessment processes under §404 of the Sarbanes-Oxley Act, including reports on any "material weakness" or "significant deficiency" and the Company's remediation steps.

52.     The Audit Committee Charter states that the Audit Committee shall "review the

adequacy of the Company's disclosure controls and procedures."

53.     The Audit Committee Charter additionally states that the Audit Committee shall "periodically discuss the Company's policies for identifying, monitoring and managing risk."

## SUBSTANTIVE ALLEGATIONS

### Background

54.     Lumen, formerly known as CenturyLink, is a Louisiana Corporation based in Monroe, Louisiana.

55.     Lumen states that it is an international facilities-based technology and communications company focused on providing its business and residential customers with an array of integrated products and services necessary to fully participate in a rapidly evolving digital world.

56.     Throughout the Relevant Period, the Company provided fiber infrastructure delivering high-bandwidth telecommunication services to residential and SMB markets through its Quantum Fiber brand, as well as services to the enterprise and wholesale markets through its Lumen brand.

57.     Lumen also provides mass-marketed legacy copper-based services under the CenturyLink brand.

58.     At the start of the Relevant Period, the Company announced that it would expand its business, which then-served the enterprise and wholesale markets, by utilizing its 400,000 miles of fiber optic cable to provide its Quantum Fiber service to the SMB and residential markets.

59.     On February 9, 2022, however, the Company acknowledged that the expansion into the SMB and residential markets was proceeding slower than previously stated.

60.     On November 2, 2022, Lumen's then-President and CEO, Defendant Storey, stated that, with respect to the Company's Quantum Fiber services, "we are not yet at the pace of build we expect or want."

61.     On February 7, 2023, the Company admitted that it was re-evaluating its strategic priorities and that Lumen had essentially stopped its investment in the Company's Quantum Fiber network, as well as its expansion into the SMB and residential markets.

***False and Misleading Statements***

62.     The Relevant Period begins on September 14, 2020, when the Company, formerly known as CenturyLink, issued a press release announcing that it would be rebranding itself as Lumen and stating that it had launched its Quantum Fiber brand. The press release described Quantum Fiber as "a fully digital platform for delivering fiber-based products and services to residents and small business" utilizing "the Power of Lumen's extensive fiber network and infrastructure."

63.     During a November 4, 2020 earnings call regarding Lumen's third quarter 2020 financial and operating results, Defendant Storey stated:

> As you can see on Slide 6, while Lumen is the name of our company and our flagship brand for serving enterprise and wholesale markets, we also launched Quantum Fiber. Quantum Fiber is our brand for serving fiber-based services to small business and consumer customers. And just as with Lumen enterprise customers, we're offering our Quantum customers a simplified, highly digital customer experience with expanded tools for managing the Quantum platform with mass market efficiency.
>
> As we continue deploying Quantum Fiber services to the small business segment, we intend to utilize our more than 170,000 on-net, fiber-fed buildings as a starting point, targeting small businesses in tens of thousands of existing buildings. We know that bandwidth is critical for these customers, and our simple, resilient, all-digital Quantum services are well positioned to meet those needs. While Lumen's primary focus is enterprise, we have a dedicated leadership team whose sole focus is to leverage our Quantum investments to grow the consumer and small business markets.

64.     During that same call, Defendant Dev stated that the Company was "investing in the products and services that support the Lumen platform. We also **continue to invest in expanding our fiber footprint** and our digital customer and employee experience."[2] In response to an analyst question, Defendant Storey further stated that "from a going-forward perspective, **we think that the products, the capabilities that we're layering on top of the great fiber and network infrastructure that we have in place today really position us to grow revenue, and we'll continue to focus on that.**"

65.     On December 2, 2020, during a conference presentation, Defendant Dugan stated "we have been investing heavily in our consumer fiber business," "I think the combination of a great service and a great experience [with respect to Quantum Fiber] will absolutely let us win," and that investing between four main categories of fiber are "all **relatively significant investments** for us."

66.     On January 6, 2021, at the Citi Global TMT West Conference, Defendant Morche touted Lumen's success with and continued investment in Quantum Fiber:

> And also want to call out our Quantum Fiber business in the consumer organization. We added 46,000 gig customers last quarter alone. So **we're seeing really good pockets of growth.** And it's going to happen piece by piece as we continue to drive the business forward and invest more. So that's kind of on the operating side.

67.     On February 10, 2021, during an earnings call regarding the Company's financial and operational results for the fourth fiscal quarter of 2020, Defendant Dev stated:

> In addition to fiber-enabled locations, we are now reporting fiber subs and ARPU. **Quantum Fiber represents a growth opportunity for us along several fronts.** Fiber-enabled homes are less than 15% of our footprint, and we continue to invest with our micro-targeting strategy. Given that a significant number of enabled units were added in the past couple of years, driving up penetration represents a near-term addressable market opportunity. Moreover, we have deemphasized low-speed

---

[2] Unless otherwise indicated, all emphasis is added.

offerings over fiber, and our typical new sales ARPU now is generally higher than our base, representing another potential opportunity to improve the business. Finally, we are breaking out SBG broadband, which until now hasn't been a large focus for us, and we expect to improve the trajectory like we have for consumer broadband.

68.     During an Analyst/Investor Day presentation on April 7, 2021, Defendant Moreau

stated:

As Jeff mentioned, I'm here today to explain the excitement around Quantum Fiber Mass Markets platform for future growth. ***This new digital platform is rapidly improving many aspects of our business and is foundational for growing fiber customers, increasing ARPU, improving customer experience and reducing churn.*** The past year accelerated an ongoing trend. More people are working from anywhere, learning from home, streaming video and using data-intensive applications like online gaming and virtual reality. We have seen a shift in how we consume video and leverage IoT technology for smarter and safer homes. Consumers and small businesses require safe, reliable, high-bandwidth broadband and with fast download and upload speeds.

Quantum Fiber can deliver that now and into the future as these trends continue. Quantum Fiber is uniquely positioned to fulfill that demand by delivering fiber-based broadband services to our consumer and small business customers in a unique and distinct way, one that gives customers freedom, control, confidence and security they need to power their personal and professional lives. With cable's asymmetrical speed, upload speeds are often far slower than their download speeds, impacting the quality of file uploading, video conferencing, online gaming and other data-intensive applications. Quantum Fiber broadband can deliver symmetrical speeds, creating a compelling value proposition for a large and growing part of the market, leveraging Lumen's highly secure, reliable and vast fiber network coupled with our fully digital-enabled customer experience. We can differentiate Quantum Fiber against our competitors and the industry, and our customers are starting to tell us that. Quantum Fiber is a reinvented digital approach for customers, a simplified digital experience with a transformed customer success and support model.

We review the entire customer life cycle to eliminate pain points and friction, increase the ease of use and simplify the process from first touch to support. A Quantum Fiber customer's bill looks as simple as your monthly Apple subscription notice, 100% prepaid subscription-based pricing with flexible payment options, including Apple Pay and PayPal with more to come. Since we began launching Quantum Fiber, we have eliminated over 50% of human interactions with our new digital platform.

It's not enough to have an amazing platform, we must also deliver results. In 2020,

we expanded our fiber footprint by 400,000 locations. ***We've committed to future footprint expansion using our micro-targeted urban densification focus and disciplined approach that benefits multiple Lumen business units and customer segments. With urban densification, we can take advantage of many efficiencies in fiber enablement from planning to market readiness and achieve higher sales through targeted digital and local marketing tactics.***

In one of our top Tier 1 markets, we are already 40% fiber-enabled and plan to continue our expansion in dense urban clusters. ***We are also leveraging Lumen's on-net buildings to grow our small business market share and connect MDUs and MTUs that are near net to our national fiber footprint.*** 100% of our sales are through online ordering, delivering an amazing customer experience, reducing order cancellation rates before install and lowering operating expenses associated with poor traditional service ordering.

***Fiber is delivering a 20% reduction in run rate-level churn over historical levels, improving revenue and margin trends.*** Quantum Fiber eliminates complexity and enhances the support model for our customers. Our customers are loving the simplicity, ease of use and service that it provides. As a result, we are seeing significant improvement in the customer experience measured by Net Promoter Score. Our 2021 year-to-date aggregate NPS scores for Quantum Fiber customers is at positive 76, higher than Amazon or Apple. As you know, NPS scores above 50 are considered excellent.

We are also seeing a 50% reduction in churn before install from our enhanced communications and delivery processes. With an all-digital platform, superior fiber broadband service and the early successes we are seeing, what should you expect from Quantum Fiber in the future? ***Future investments will continue to focus on driving urban densification using our micro-targeted approach. With over 23 million living units and small businesses in our footprint, we have a vast footprint to select from to grow our fiber enablement***. We have the ability to operate outside our footprint anywhere Lumen's fiber is in proximity to MDU and MTU developments.

***Next, we are aggressively taking market share in our small business segment, especially with MTUs located in dense markets where we have fiber-lit buildings. In the first quarter, we are seeing a fourfold year-over-year improvement in small business fiber broadband net adds. With approximately 2.4 million locations fiber-enabled and 28% fiber penetration rate at year-end, we have a significant future growth opportunity with the investments we have already made. We expect to complete the launch of Quantum Fiber across all markets during 2021.***

With that comes our enhanced go-to-market, including local market accountability to drive growth at the neighborhood or building level, micro-targeted sales and marketing efforts and a differentiated world-class customer experience. ***As we grow fiber penetration, we have a path to continue growing customer ARPU.*** We are

bringing to market products and services such as fully managed WiFi and other advanced services that enable growth in wallet share, pull-through additional fiber sales and enhance the overall experience.

Finally, ***we plan to deliver sustained growth with Quantum Fiber well into the future by growing our market share, footprint, revenue and customer ARPU***. Thank you for your time.

69.     During the same investor day presentation, Defendant Storey reiterated:

The bottom line is we are investing in a unique platform of capabilities and solutions. ***We are attracting new customers and growing our base. The industry is recognizing this, and our shift to delivering application technology is only going to accelerate.*** On the mass market side of our business, we're excited about Quantum Fiber and our fiber-based services to consumers and small businesses. We believe our fiber-to-the-premises technology is superior to any wireless or HFC-based offerings of our competitors now or in the future.

The symmetrical nature of our fiber-to-the-premises solutions deliver differentiated performance for work from anywhere, remote education and similar use cases. As you know, ***we continue expanding our Quantum Fiber footprint and increasing our penetration. Our blended penetration of new and previous builds is almost 30%. To me, the existing penetration rate validates our Quantum Fiber strategy and represents an opportunity as we continue to drive penetration higher***.

70.     Also during the investor day presentation, in response to an analyst question regarding market penetration, Defendant Storey stated:

Maxine touched on the fact that we want to have an urban densification in our fiber-to-the-home. We think it's a great opportunity. ***And we continue to invest in that. And we've proven over the last couple of years that where we invest, we can grow, where we invest, we can drive penetration.***

And so I'll continue to focus Maxine and her team as she is on how do we increase the penetration in the markets where we are, but then also how do we continue to use our micro-targeting efforts to expand our footprint. We think there's tremendous opportunity for us. But we also don't view it just as a fiber solution. If you listened to Maxine, it's the overall digital experience of Quantum Fiber that we bring to our customers, the way they buy our services, the way they consume our services, the way we deliver them, the way we secure them and make them robust for our customers.

***And so we'll continue to heavily invest in that. We think that we're investing at approximately the right pace. We'll probably pick up speed as we move forward.*** But we've been making sure that we deliver on the value proposition, ***we get the***

*return on investments and that we're able to drive the penetration.* And what Maxine and her team have done have proven all of that strategy to us. So with that, I'll hand it over to Maxine if you want to make any more comments.

71.     Likewise, during the presentation, Defendant Moreau stated:

Thank you, Jeff, and thanks for the question, Simon. I would say we don't have a ceiling target. We believe that our fiber product is superior to any wireless solution, wired fiber. Our fiber-first strategy is our focus and will continue to be our focus. And Neel has been very clear. We don't -- *we're not capital-constrained. So as we continue to improve our penetration and performance, we'll continue to expand 14 our footprint, and we believe we've got a long runway for growth in -- within Lumen in Quantum Fiber.*

72.     Also on April 7, 2021, the Company filed a proxy statement on Form DEF 14A with the SEC (the "April 7, 2021 Proxy"), which stated "We are investing in Quantum Fiber to deliver fiber-based services to small business and consumer customers, delivered through our simplified, highly digital customer experience."

73.     During a September 13, 2021 presentation, Defendant Andrews stated that recent changes at Lumen are "congruent with our focus and aligned with our focus on really *investing where we can grow and focusing on the Quantum Fiber experience in Mass Market* and then the growth aspects of Enterprise." During that same presentation, Andrews further detailed Lumen's plans for Quantum Fiber to "win back market share" in the small and medium business marketplace:

And early on when we were looking at the Mass Markets opportunity, we were clear. *We're going to invest where we can grow, and we're going to invest where we can grow with fiber*, and Maxine has done a fantastic job with that. Now we have Quantum Fiber in the marketplace, where not only do you get a fiber experience, but it's all digital and seamless and quick.

74.     Andrews further stated during the presentation:

That *further investing in growth opportunities* is not only along the lives of edge compute and connected security and unified communications, *but it's also within Quantum Fiber and Mass Market. So there is an opportunity for us to grow there. We do have our line -- our eyes set on where that is. And we are extremely*

*focused, and part of the transaction with Apollo was really to cleave off the part where we weren't going to invest and grow and leave us with the part that's really ripe for further investment and growth.*

75.     The Individual Defendants' statements identified above in ¶¶ 63-74 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Quantum Fiber was not progressing to the extent that the Company had been representing to the public; (ii) the Company had been re-evaluating its strategic priorities and had essentially stopped its investment in the Company's Quantum Fiber network; and (iii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

76.     The truth began to emerge during an earnings conference call regarding Lumen's fourth quarter 2021 financial and operational results on February 9, 2022, when Defendant Storey revealed that supply chain and inflationary issues were impacting the Company's Quantum Fiber network growth:

> So Simon, on the build plan for Quantum Fiber, it's not going to be linear. It takes a while to ramp these capabilities, to do the engineering, to make sure that we've got the construction resources in place. So it's not going to be linear but it's not going to be fully back-end loaded either. We're already at a pace of, call it, 400,000, 500,000 homes and business locations. So there's going to be that as a starting point, but we'll get to the full 1 million toward the end of the year, obviously. So it's a little back-end loaded but not substantially.
>
> What keeps us from going faster? This is hard work. It's hard work. There's a lot of things to do. We want to make sure that we do it right. We're exceptionally good at building networks and we will continue to do that with the Quantum Fiber build, but there's hard work. And ***we also have supply chain challenges. And I mentioned that in the prepared remarks. I don't want to overemphasize it but it's an issue, and we see it with equipment vendors and chips and them getting access to chips. So we'll continue to manage that, but that's also a constraining factor on how to accelerate faster.*** Now the main point is we want to accelerate to a point of 1.5

million to 2 million homes by the end of the year. So we want to be on that run rate finishing the year and going into 2023. And that's really a large effort to make sure that we do go as fast as we possibly can.

77.     On this news, the price of Lumen's stock declined more than 15.5%, from a closing price of $12.82 per share on February 9, 2022 to a closing price of $10.83 per share on February 10, 2022.

78.     The price of the Company's stock remained artificially inflated, however, as the Individual Defendants continued to mislead investors and the public. For instance, on February 24, 2022, the Company filed its 2021 annual report on Form 10-K with the SEC (the "2021 Annual Report"), signed by Defendants Storey, Glenn, Hanks, Dev, Allen, Bejar, Brown, Chilton, Clontz, Jones, Roberts, and Siegel. With respect to the Company's strategy, the 2021 Annual Report explained that the Company was planning to "expand [its] network capacity through [Lumen's] Quantum Fiber buildout plan." The 2021 Annual Report further stated that "[a] key element of [Lumen's] network expansion plan is [its] Quantum Fiber buildout project. Under this project, we propose over the next several years to construct additional fiber optic infrastructure to enable us to provide Quantum Fiber broadband services to several million additional urban and suburban locations in our [incumbent local exchange] markets."

79.     In a proxy statement filed on Form DEF 14A on April 8, 2022 (the "April 8, 2022 Proxy"), the Company stated:

> We are confident in our ability to grow revenue in the coming years as we are seeing early traction with edge compute and our Quantum Fiber build plan. Quantum Fiber enablements are expected to ramp in 2022 from our 400,000 location historical run rate to as many as 1.5 to 2 million locations exiting the year. The broadband penetration rate of our Quantum Fiber-enabled locations is already more than double that of our copper-enabled locations. 2022 is an investment year for Lumen.

80.     The April 8, 2022 Proxy Statement further stated:

During 2021, we made progress advancing our core business strategy to integrate

and upgrade our global network and other assets and technologies into an advanced high-bandwidth, low latency platform that is secure, reliable and fast. To that end, we focused our efforts on strengthening our digital self-service product ordering platforms, expanding our offering of secure edge computing services, creating a more adaptive network, and expanding our network capacity through our Quantum Fiber buildout plan and other initiatives.

81.     The truth continued to emerge on November 2, 2022, during a conference call regarding the Company's financial and operational results for the third fiscal quarter and nine months ended September 30, 2022, when Defendant Storey revealed:

> I'd like to talk more specifically about our digital transformation and the foundation we laid for our business going forward. Digital transformation is not a destination, but it's a journey. I'm very pleased with the significant strides we've made in driving simplicity and automation into our business. We are now easier to do business with, have greater efficiency and are evolving the way our customers interact with and experience our capabilities.
>
> Our customer experience is better than ever and continues to improve as demonstrated by our very high NPS and customer e scores for both Quantum Fiber and the upper end of our enterprise customer base. ***Although not yet where we want to be, our results with our mid-market customers clearly show we're making progress there as well.***
>
> *     *     *
>
> On the Mass Markets side, we have ramped our investment in the Quantum Fiber footprint and our all-digital service delivery platform. We've doubled the number of new enablements per quarter over last year. ***So let me be clear, we are not yet at the pace of build we expect or want. We will continue to ramp our enablements and overcome the supply chain, labor and inflationary constraints we've seen***.

82.     In response to a question regarding what was holding back the network build out, Defendant Storey stated:

> ***If you look at our our fiber enablement, we're not doing it as fast as we want to do.*** So let me lead with that. We're not doing it as fast as we want to be deploying new enablement. ***There are a lot of things that go into that supply chain constraints, labor shortages, inflationary pressures and those types of things.*** And we'll continue to work through those. So I'm not terribly worried about it, but we'll work through them.

83.     On this news, the price of Lumen's stock declined 17.7%, from a closing price of $7.05 per share on November 2, 2022 to a closing price of $5.80 on November 3, 2022.

84.     On February 7, 2023, during a conference call regarding the Company's financial and operational results for the fiscal quarter and full year ended December 31, 2022, Defendant Johnson stated:

> *Second, let's talk about our Quantum pacing. As we've said previously, we hit the pause button during the fourth quarter. Now to be frank, it was more of a stop button than a pause button, which impacted our Quantum metrics for the quarter*. That said, the evaluation we undertook was absolutely critical to position Quantum for long-term success. By focusing on all metrics and not just the location enablement goal, we've established a higher IRR, more predictable long-term outcome for this exciting project.
>
> A natural outcome of our assessment of Quantum is a more focused build target where we're able to achieve proper returns for shareholders. We believe the overall Quantum enablement opportunity is 8 million to 10 million locations. *The engine is revving back up, and we're aggressively working to ramp our build activities in 2023*. And to that end, we made an important change during the fourth quarter to separate our operational activities like planning, engineering and all field operations between mass markets and business.
>
> Maxine Moreau, our President of Mass Markets, now has top to bottom operational and P&L responsibilities. *This is a significant change internally that I expect will improve our Quantum deployment pacing, but it will take time to reach scale. My expectation is that later this year*, you'll see significant improvement in our execution on enablement.

85.     During that same call, Defendant Stansbury further explained the delays in Quantum Fiber expansion:

> As Kate discussed, *we have made significant changes in how we are approaching the Quantum Fiber opportunity.* This was a thoughtful evaluation that will result in a significant improvement in long-term shareholder value. That said, *our location and subscriber results were impacted by the pause we had in place through our evaluation. This change in strategy will continue to impact Quantum metrics until we get to scale with our new plan, which we expect to occur late this year*. During the quarter, total enablements were approximately 97,000, bringing the total enabled locations to over 3.1 million as of December 31. During the quarter, we added 19,000 Quantum Fiber customers, and this brings our Quantum Fiber subscribers to 832,000.

86.     On this news, the price of Lumen's stock declined more than 20.8%, from a closing price of $4.99 per share on February 7, 2023 to a closing price of $3.95 per share on February 8,

2023.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

87.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

88.     Lumen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

89.     Plaintiff is a current shareholder of Lumen and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

90.     At the time this action was commenced, the fifteen-member Board was comprised of Individual Defendants Johnson, Allen, Bejar, Brown, Chilton, Clontz, Glenn, Jones, and Siegel, along with Diankha Linear and Jim Fowler, who joined the Board after the Relevant Period and are not parties to this action.

91.     The Director Defendants ether knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

92.     The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

93.     Additionally, the Director Defendants received payments, benefits, stock options,

and other emoluments by virtue of their membership on the Board and their control of the Company.

94.     Moreover, the Director Defendants willfully ignored, or acted with severe recklessness by failing to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

95.     Nonetheless, by letter dated July 5, 2023, Plaintiff made a demand on the Board to investigate and remedy the violations of law described therein (the "Litigation Demand"). *See* Exhibit A.

96.     In the Litigation Demand, Plaintiff demanded as follows:

Mr. Ostrow hereby demands that the Board take "suitable action" pursuant to LA Rev Stat § 12:1-742. Specifically, Mr. Ostrow demands that the Board initiate and complete an investigation into the violations of federal law and breaches of fiduciary duties under Louisiana law, waste of corporate assets, unjust enrichment, and violations of all other state laws, regulations, and rules by members of the Board and Lumen's executives and employees regarding Company's investment and penetration of the SMB and residential markets. Such investigation must cover not only the facts cited herein but any other credible indication of misconduct by the Board and Lumen's executives and employees concerning the investments, future investments, and build out of the Company's Quantum Fiber network. This investigation must be conducted by independent and disinterested Board members with the assistance of independent outside legal counsel and other advisors, as needed.

Mr. Ostrow demands that the Company commence legal proceedings against each party identified as being responsible for the misconduct identified by the independent investigation. Such legal proceedings must seek to have each wrongdoer jointly and severally reimburse the Company for the harm they have caused Lumen. The legal proceedings shall also seek to recover the salaries, bonuses, director remuneration, and other compensation paid to the responsible individuals. All such litigation must be commenced timely and within applicable statutes of limitations.

The above-described events also demonstrate the need for significant corporate governance and operational policy changes to ensure compliance with applicable laws and regulations. These reforms should address not only the Company's public

disclosures, but also compliance with laws and regulations generally applicable to companies like Lumen, such as the securities laws.

97.     The Litigation Demand outlined alleged misstatements issued by certain of Lumen's executive officers and members of its Board "concerning the purported success of the Company's Quantum Fiber investment strategy."

98.     The Litigation Demand was delivered on July 7, 2023. *See* Exhibit B. The Board has failed to respond to the Litigation Demand and has not evaluated its merits in good faith based on all information reasonably available to it.

99.     The Board's failure to respond to Plaintiff's Litigation Demand constitutes a wrongful refusal of the Litigation Demand, is unreasonable and improper, and demonstrates the Board's lack of good faith.

100.     Accordingly, refusal of the Litigation Demand is not a valid exercise of business judgment and, therefore, Plaintiff is permitted to proceed and to prosecute this action derivatively on behalf of the Company.

## <u>COUNT I</u>
### Against the Pivotal Defendants for Violations of § 14(a)
### of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

101.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.     The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

103.     The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the April 7, 2021 Proxy and the April 8, 2022 Proxy filed with the SEC. As alleged above, these filings contained materially false and misleading statements concerning the Company's Quantum Fiber investment

strategy.

104.    The April 7, 2021 Proxy was used to solicit shareholder votes in connection with the election of Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Storey to serve for another one-year term on the Company's Board. In addition, the April 7, 2021 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Storey, Dev, and Andrews. While the shareholder vote was non-binding, the April 7, 2021 Proxy indicated that the vote would "provide valuable information for future use by our [Human Resources and Compensation Committee] regarding shareholder sentiment about our executive compensation."

105.    Describing the Company's "Compensation objectives and design," the April 7, 2021 Proxy indicated that the compensation is performance-based: "Performance-based compensation rewards performance over multiple time horizons and aligns with long-term shareholder value while discouraging risk taking."

106.    Similarly, the April 8, 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Storey to serve for another one-year term on the Company's Board. The April 8, 2022 Proxy was further used to solicit the advisory vote to approve the performance-based compensation of Defendants Storey, Dev, and Andrews.

107.    The materially false and misleading statements contained in the April 7, 2021 Proxy and the April 8, 2022 Proxy regarding the Company's Quantum Fiber investment strategy therefore misleadingly induced shareholders to vote in favor of the election of Defendants Allen, Bejar, Brown, Chilton, Clontz, Glenn, Hanks, Jones, Roberts, Siegel, and Storey, and performance-based compensation to Defendants Storey, Dev, and Andrews, to which they were

not entitled.

108.     The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

**COUNT II**
**Against the Individual Defendants for Breach of Fiduciary Duty**

109.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

111.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

112.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise acting with severe recklessness by failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

113.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

114.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

115.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

117.     Plaintiff on behalf of Lumen has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants for Unjust Enrichment

118.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lumen.

120.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lumen that was tied to the performance or artificially inflated valuation of Lumen, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

121.     Plaintiff, as a shareholder and a representative of Lumen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

122.     Plaintiff on behalf of Lumen has no adequate remedy at law.

<u>**COUNT V**</u>
**Against the Individual Defendants for Waste of Corporate Assets**

123.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Lumen's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

125.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the

Securities Action, and approving performance-based compensation linked to the Company's perceived successes.

126.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127.    Plaintiff on behalf Lumen has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: Aug. 23, 2024

Loren D. Shanklin/s/, Bar Roll No. 33366
Alicia M. Sosa, Bar Roll No. 34101
SMITH SHANKLIN SOSA, L.L.C.
16851 Jefferson Highway, Suite 7C
Baton Rouge, Louisiana 70817
Telephone: 225-223-6333
Facsimile: 888-413-8345
Email:loren@smithshanklin.com;
service@smithshanklin.com

Russell A. Woodard, Jr./s/ (34163)
Law Offices of Russell A. Woodard, Jr. LLC
119 Pelican Blvd, Ruston LA 71270
(P) 318.255.4898   raw@therawlaw.com

*Attorneys for Plaintiff*

*Of Counsel:*

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Gina M. Serra
Samir Aougab
825 Esat Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
        tjm@rl-legal.co
        gms@rl-legal.com
        sa@rl-legal.com

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  267-507-6085
Email: jgrabar@grabarlaw,com